960 So.2d 31 (2007)
Jay GORDON, Appellant,
v.
STATE of Florida, Appellee.
No. 4D04-4432.
District Court of Appeal of Florida, Fourth District.
May 23, 2007.
Rehearing Denied August 8, 2007.
*32 Carey Haughwout, Public Defender, Margaret Good-Earnest and Tatiana Bertsch, Assistant Public Defenders, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Joseph A. Tringali, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
Jay Gordon appeals a number of orders from an indirect criminal contempt proceeding arising from a family law case. We agree with Gordon on one issuethat in this unique case, the trial court erred in failing to appoint the public defender to represent him at a contempt hearing and at sentencingand reverse for a new contempt hearing with appointed counsel. We reject his other attacks on the proceedings and affirm the circuit court on those matters.
At one time, Gordon was married to Elizabeth Savitt. As part of a contentious divorce proceeding, the circuit court entered a permanent domestic violence injunction directed at Gordon. See § 741.30, Fla. Stat. (2006).
On April 2, 2004, Savitt moved for an order to show cause why Gordon should not be held in indirect criminal contempt for willfully violating the injunction. Attached to the motion, Savitt's affidavit catalogued instances of verbal abuse and threatening conduct including:

*33 1) references to news reports of murders of one spouse by another, with the suggestion that a similar fate would befall Savitt;
2) telephone calls where Gordon screamed at Savitt in a "threatening . . . verbally abusive, berating" manner;
3) an incident in the fall of 2003 at a children's soccer game, where Gordon came behind Savitt and whispered, "You're going to get it. I want my son back;"
4) incidents of intimidation during the exchange of the parties' minor child; and
5) Gordon's stalking of Savitt at a shopping center.
On April 22, 2004, after a hearing, Judge Berger entered an order to show cause why Gordon should not be held in indirect criminal contempt. The body of the order stated no facts constituting the alleged contempt, but incorporated and attached Savitt's motion and affidavit. The order set an arraignment for May 12, 2004 and appointed Savitt's attorney, Jonathan Root, as a prosecutor. Judge Berger then disqualified himself from the case, which was reassigned to Judge Colbath.
At the July 6, 2004 arraignment, Judge Colbath explained an arraignment to Gordon and invited him to make a statement. Gordon gave a rambling explanation of the factual and procedural history of the case. Then, Gordon handed the court his own affidavit, which the judge treated as a plea of not guilty.
Perfunctorily questioned by the court on the issue of his indigency, Gordon said he had a net worth of about $10,000, that he owned a car, and had $2,000 in retirement funds. The court found him not to be indigent for the purpose of appointing the public defender, but acknowledged that, at some point in the future, Gordon might qualify as indigent. Whether Gordon should be admitted to bond was not addressed at the hearing, so his status was tantamount to release on his own recognizance. See Fla. R.Crim. P. 3.840(c). On July 14, 2004, the court entered a written order summarizing its rulings at the July 6 arraignment.
On September 21, 2004, Gordon moved for a change of venue, among other things. The basis for the motion was that Savitt's "boyfriend" and main witness in earlier proceedings, Martin Colin, had recently been elected a circuit judge in the Fifteenth Judicial Circuit.
On September 29, 2004, the court held a contempt hearing on the allegations in the order to show cause. Gordon renewed his request for the services of a public defender. The court again briefly inquired into Gordon's financial condition. He claimed that he did not work[1] and had liabilities that exceeded his limited assets. The court again found Gordon not to be indigent and also denied his motion for a change of venue.
In his opening statement, Gordon portrayed himself as a 61 year old "caring and loving, involved father who wants to play a meaningful role in [his] son's life." He blamed his predicament on Savitt's desire to exclude him from his son's life and on Colin, who had served as Savitt's attorney *34 during the divorce; he told the judge, "[u]ntil Martin Colin got a hold of me three years ago, I had not been involved with the police or any court in any way whatsoever. I've never even had a speeding ticket or a moving violation at any time in my life. Now I stand before you facing criminal charges." Because the opening statement strayed far from the contempt issue, Judge Colbath tried to get Gordon to focus on the purpose of the hearing.
Savitt's attorney first called judge-elect Colin as a witness; he testified to numerous instances of Gordon's conduct specified in the order to show cause. Savitt was the second witness. She authenticated six audio tapes of phone conversations between herself and Gordon. Using a log that she kept, Savitt described other incidents occurring after August, 2003. Gordon cross-examined the witnesses and offered evidence and testimony.
After closing arguments, the court found that Gordon had knowingly and willfully violated certain terms of the injunction and found him not guilty of violating other aspects of the order. The judge adjudicated Gordon to be guilty. The judge did not impose sentence. The court said:
Now with regard to an appropriate sentence, I don't know what sentence I'm going to impose at this point. I'm going to have you remanded to the custody of the Palm Beach County Sheriff's Office right now. And I'm going to pass your case for about a week until I can figure out what I want to do with you. . . . At that time I'll impose a sentence.
The court entered a written judgment of guilt and order of remand and set sentencing for October 5, 2004.
At the October 5 sentencing hearing, the judge heard from Savitt and judge-elect Colin. Colin testified about the effects of Gordon's conduct upon Savitt and told the judge that the "only thing" that would "stop his arrogance" would be "to spend more time in the Palm Beach County jail." Savitt told the judge about other incidents of threatening conduct. Savitt's attorney asked the court to impose a sentence of two to three months incarceration followed by a year of probation, with the requirement that Gordon (1) seek treatment for anger management and other psychological treatment and (2) reimburse Savitt's attorney's fees. Gordon called his sister as a witness, who told the court that her brother's genuine desire to father his son was frustrated by the restraining order Savitt obtained. Gordon explained that he had no desire to harm Savitt and that some of his communications with her had been a mistake. He contended that the picture of him painted by Colin and Savitt was "disconnected from reality."
After hearing from both sides, the court discussed the case, pointing out that both Savitt and Gordon had engaged in conduct detrimental to their son. The court explained that he meant for Gordon "to spend the brief period of time in jail . . . to try to shock [Gordon] into . . . the rest of the world's reality." The court indicated that it would not impose a sentence at that time and reset sentencing for December 15, 2004; the court released Gordon from jail with the certain conditions, including that Gordon have the opportunity to see a psychiatrist or counselor or psychologist selected by "Savitt and her attorney, Mr. Root", with the implied understanding that the court would consider any visits to this counselor at sentencing. The court also indicated that it would evaluate Gordon's conduct between October 5 and December 15 in imposing a sentence:
I'm going to take some testimony, as I did here, to find out what has happened during some time in October and going into December. So I want to know what you're doing in the next two months.

*35 If I find that there is any new misconduct, if there are any problems with visitation, I'm going to consider that in my final imposition of a sentence. And I will tell you this: if I believe with certainty that all of the allegations that are difficult to prove, if what they said truly happened and it very well might have been, but prove beyond a reasonable doubt that it did-a high hurdle to jump over, but if I were convinced with the same certainty as I was with the other matters, I will give you the whole six months in jail. But I am largely leaving your sentencing in your hands.
So I have a pretty good idea of what you have done. I know what additional things they think you've done, and I want to see how the next two months go. You tell me that there is never going to be another problem; I hope that is true. I hope the two of you can somehow try to figure out how to get along together.
The court's written order indicated that Gordon was "released from PBSO A.S.A.P.O.R.sentencing to be reset to 12/15/04 @ 9:30 AM."
On December 15, 2004, Gordon appeared before the court for sentencing. Savitt told the judge that she had "endure[d] great difficulties from Mr. Gordon . . . for almost three years." She described incidents of Gordon's misconduct that occurred after the October 5 hearing. On cross-examination of Savitt, Gordon established that he had never physically touched her during the three year period and that Savitt had sent him sarcastic and insulting emails. In a lengthy statement to the court, Gordon acknowledged that he was in "a very serious situation," but he denied committing the acts of misconduct that Savitt described.[2]
After hearing from both sides, the trial court said, "I'm going to find Mr. Gordon guilty of indirect criminal contempt in that he violated a prior court order." As a sentence, the court placed Gordon on probation for one year, with the special condition of 30 days in the county jail on weekends, with credit for time already served, and regular counseling by a psychologist.
Gordon timely filed a notice of appeal and was admitted to appeal bond the following day. The public defender was appointed to represent him for the appeal.
Gordon contends that fundamental error occurred when Judge Berger's order to show cause failed to state essential facts of the alleged contempt.[3] Rule 3.840 requires that an indirect criminal contempt prosecution be commenced by an order to show cause "stating the essential facts constituting the criminal contempt charged." In Giles v. Renew, 639 So.2d 701, 702 (Fla. 2d DCA 1994), we indicated that a defendant's "due process rights will be protected if the order expressly incorporates and attaches the sworn petition to the order in place of setting forth the facts in the order." Our reading of the order to show cause is that it incorporated and attached Savitt's motion for contempt and supporting affidavit, so that no fundamental error occurred. We also reject the argument *36 that a fundamental error occurred in Judge Colbath's finding of contempt. Although the hearing could have been conducted in a different fashion,[4] we cannot say that the evidence failed to support the court's finding of contempt.
Gordon challenges the circuit court's failure to appoint a public defender to represent him at trial. "Florida law requires a public defender to represent indigent defendants but a court `may not appoint the public defender to represent, even on a temporary basis, any person who is not indigent.'" Haughwout v. Mellor, 870 So.2d 895, 896 (Fla. 4th DCA 2004) (quoting § 27.51(2), Fla. Stat. (2003)). The trial court's decision about whether to appoint a public defender is reviewed under an abuse of discretion standard. See Romani v. State, 429 So.2d 332 (Fla. 3d DCA 1983); Keur v. State, 160 So.2d 546, 549-50 (Fla. 2d DCA 1964). At the July 6, 2004 arraignment, Gordon admitted to having $12,000 in assets and a car. Previously, he had retained a lawyer in his divorce. Contempts arising out of family law cases often require a trial judge to carefully assess the credibility of insolvency claims. We find no abuse of discretion in the circuit court's failure to appoint the public defender at the July 6 arraignment.
However, when Gordon requested appointed counsel at the September 29 contempt hearing, a different set of circumstances existed. Colin had been elected a circuit court judge earlier that month. One of the tests of indigency is that a "person is unable to pay for the services of an attorney without substantial hardship to his or her family." § 27.52(2)(b)2, Fla. Stat. (2003). The determination of ability to pay includes an inquiry into the probable expense of defending the case. A likely effect of Colin's election was to reduce the pool of attorneys who would accept a case opposing the girlfriend of a circuit judge elect or to increase the fee that might be commanded for such representation. As Gordon points out, this was a difficult case, requiring an attorney experienced in both family and criminal law, "not your typical misdemeanor case that a defense attorney might be willing to handle for around $1,000." The case called for an experienced attorney willing to familiarize herself with the extensive prior history in the case. Savitt's attorney, who was already conversant with the litigation, testified that $11,565 was his fee to prosecute the contempt. An attorney unfamiliar with the case would likely have demanded an even greater fee to defend Gordon.
The trial court never inquired as to Gordon's efforts to hire an attorney and what fees attorneys quoted him. At no time did the court reset a status check for further inquiry on Gordon's efforts to hire counsel. The only evidence in the case, which went unchallenged, was that Gordon was insolvent by the time of the September 29, 2004 contempt hearing. Two months later, the public defender was appointed to handle the appeal. Under these unique circumstances, we hold that the circuit court erred in failing to appoint the public defender prior to the September 29 contempt hearing.
We address other claims raised by Gordon because they might arise on remand.
We reject Gordon's claim that he was entitled to a jury trial. "The denial of a request for a jury trial in a contempt proceeding limits the maximum term of imprisonment to six months on a finding of guilt." Wells v. State, 654 So.2d 146, 147 (Fla. 3d DCA 1995). Even though Gordon's *37 sentence involved a one year probationary term, "his total maximum term of imprisonment would still be six months even on a probation violation." Id.
Gordon complains that Judge Colbath did not grant his motion to change venue from the Fifteenth Judicial Circuit despite Colin's election as a circuit judge. Florida Rule of Criminal Procedure 3.240(a) provides that the ground for a change of venue is "that a fair and impartial trial cannot be had in the county where the case is pending for any reason other than the interest and prejudice of the trial judge." Especially in a circuit as large as the Fifteenth, the presence of a circuit judge-elect as a witness in a case does not mandate a change of venue. Gordon's motion fell outside of the rule, because it was essentially a claim that all the judges in the circuit would be prejudiced because of Colin's involvement in Savitt's case. As a successor judge in the case, Judge Colbath correctly perceived that he was not subject to disqualification unless he ruled that he was "in fact not fair or impartial in the case." Fla. R. Jud. Admin. 2.330(g); see § 38.10, Fla. Stat. (2005). We find no error in the denial of the motion to change venue.
Gordon contends that Judge Berger erred in his April 22, 2004 order by appointing Savitt's attorney, Jonathan Root, as a special prosecutor to handle the indirect criminal contempt charge. He relies on Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). In that case the Supreme Court held improper a district court's appointment of attorneys who represented a trademark holder to prosecute a criminal contempt for violations of an injunction against trademark infringement. The Court observed that special criminal contempt prosecutors, like United States Attorneys, should have an undivided duty to see justice done. Id. at pp. 803-804, 107 S.Ct. 2124. The government's interest in a "dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary" is not necessarily congruent with the private client's interest in the monetary benefits of enforcing the court's injunction. Id. at 805, 107 S.Ct. 2124. The Vuitton Court concluded that because of the private attorneys' ethical duties to their own client, the conflict was unusually manifest: the Court wrote that while ordinarily "we can only speculate whether other interests are likely to influence an enforcement officer," where a prosecutor also represents an interested private party, "the ethics of the legal profession require that an interest other than the Government's be taken into account." Id. at p. 807, 107 S.Ct. 2124.
Vuitton was decided not on constitutional grounds but under the Supreme Court's supervisory authority over the lower federal courts. Id. at 808-09, 107 S.Ct. 2124. Vuitton does not establish a due process test for prosecutorial conflicts in criminal contempt cases.[5] Where the Supreme Court acts under its supervisory powers over the federal courts, its ruling is not binding on the states. See Scoggins v. State, 726 So.2d 762, 764-65 (Fla. 1999).
Although Judge Colbath appointed attorney Root as a "prosecutor," the effect of his order was to appoint Root to "assist" the court within the meaning of Rule 3.840(d) by calling witnesses at the contempt hearing. This was not a case where the court's order bestowed on Root all the powers of a prosecutor.
*38 Five factors lead to the conclusion that we should not apply Vuitton in this case involving enforcement of a domestic violence injunction.
First, to require the appointment of an independent prosecutor in all cases would nullify a remedy provided in the domestic violence statute. Section 741.30(9)(a), Florida Statutes (2006), contemplates enforcement in two distinct ways; either by the "state attorney" bringing a criminal prosecution under section 741.31, Florida Statutes (2006), or "through a civil or criminal contempt proceeding," which may be commenced by one of the parties in the case. Section 741.31 sets forth the procedures to be followed for a state attorney initiated criminal prosecution, when a petitioner contacts the clerk of the circuit court and files an affidavit that an injunction has been violated. Had the statute intended to make the state attorney the sole gatekeeper for prosecuting section 741 injunction violations, it would not have designated section 741.31 as an alternative to a civil or criminal contempt proceeding.
Second, to apply Vuitton in this case would be to cause a sea change in Florida practice, which is to allow a party to a civil case to initiate and prosecute an indirect criminal contempt proceeding to enforce an order of the court. For example, this court recently affirmed a finding of indirect criminal contempt where the proceeding was initiated and prosecuted by the aggrieved party in a civil suit. See Lewis v. Nical of Palm Beach, Inc., 959 So.2d 745 (Fla. 4th DCA 2007); Feltner v. Columbia Pictures Television, Inc., 789 So.2d 453 (Fla. 4th DCA 2001) (in a case where indirect criminal contempt proceedings commenced by a party in a civil suit, court reversed for new trial because trial court did not allow defendant to make closing argument). The practice is common in dissolution of marriage proceedings. In Lascaibar v. Lascaibar, 773 So.2d 1236 n. 1 (Fla. 3d DCA 2000), the third district approvingly acknowledged the situation where "[c]ounsel for the former wife acted as the prosecutor of the indirect criminal contempt." In Mendana v. Mendana, 911 So.2d 130 (Fla. 3d DCA 2005), the third district affirmed a conviction of indirect criminal contempt in a post-dissolution proceeding commenced and prosecuted by the former wife.
Third, if one of the parties in a civil case may initiate a contempt enforcement proceeding, it follows that the judge may appoint the attorney of the moving party to "prosecute" the case, which is to call witnesses and present evidence at a contempt hearing. This scenario falls within the rule 3.840(d) provision that a judge may conduct a contempt hearing "without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose." In Routh v. Routh, 565 So.2d 709 (Fla. 5th DCA 1990), the fifth district recognized that in a family law case the trial judge had the authority to appoint the former wife's counsel to prosecute the former husband for criminal contempt under rule 3.840.
Fourth, rule 3.840 provides adequate procedural safeguards to protect against abuse of the contempt sanction. Rule 3.840 procedures "must be strictly followed before a person is found guilty of indirect criminal contempt." Mix v. State, 827 So.2d 397, 399 (Fla. 2d DCA 2002). Precision is required at each stage of the contempt proceeding. On the judge's own motion or an affidavit by a party seeking the order, the judge may issue an order to show cause stating "the essential facts constituting the criminal contempt" and specifying the time and place of the hearing. A judgment of guilty should include "a recital of the facts constituting the contempt." Fla. R.Crim. P. 3.840. In a case arising *39 out of a dissolution proceeding, the trial court has a wide array of sentencing alternatives to ensure future compliance with its order and to punish past transgressions.
Fifth, orders in family or domestic violence cases are different than the injunction at issue in Vuitton. The Vuitton order arose in a commercial trademark infringement case where a party with deep pockets secured the appointment of its attorneys to conduct a lengthy investigation and prosecution pertaining to counterfeit handbags. In such a case, the Supreme Court observed that criminal contempt proceedings "`are between the public and the defendant, and are not a part of the original cause.'" Vuitton, 481 U.S. at 804, 107 S.Ct. 2124 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 445, 31 S.Ct. 492, 55 L.Ed. 797 (1911)). The Court wrote that the appointment of a prosecutor is "solely to pursue the public interest in vindication of the court's authority" so that a "private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." Vuitton, 481 U.S. at 804, 107 S.Ct. 2124.
Although the public has an interest in an order entered in a family law or domestic violence case, this interest is far outweighed by the interest of the party seeking the enforcement or protection of the order. The public interest in the authority or dignity of a court is abstract; a litigant's interest in receiving child support or being free from physical harm or harassment is real and immediate. For this reason, the law should not preclude such parties from using their own attorneys to prosecute indirect criminal contempts. To require the appointment of an independent prosecutor in all cases would inject delay and additional expense into proceedings where litigants are often of limited means. Although an indirect criminal contempt proceeding in a family law case is vitally important to the parties, such a case often has little interest to a professional prosecutor.
Two cases from other jurisdictions have considered Vuitton in the context of a family law case and concluded that it does not bar a party's attorney from participating in a contempt hearing. See Green v. Green, 642 A.2d 1275 (D.C. 1994); Wilson v. Wilson, 984 S.W.2d 898 (Tenn. 1998).
In Green, the husband contended that "his due process rights were violated because the wife's attorneys acted as the prosecuting attorneys during the intrafamily contempt proceedings." 642 A.2d at 1276. Similar to this case, the trial court had entered a civil protective order and the wife, through counsel, moved to hold her husband in contempt for violating it. The trial judge denied the husband's motion to disqualify the wife's lawyer from "prosecuting" the criminal contempt. Id. at 1277. The court in Green affirmed and distinguished Vuitton as a commercial case "primarily concerned with the financial and tactical conflicts of interest presented by using [Vuitton's] counsel to prosecute the criminal contempt charges." Id. at 1279. The court observed that an intrafamily case "does not present the potential for discovery abuses and financial conflicts of interest." Id. at 1279-80.
Also, Green relied on the local statutes and rules relating to the enforcement of civil protective orders, which are similar to the enforcement framework of section 741.30(9)(a), and concluded that those "provisions reflect a determination by the [legislative body] that the beneficiary of a [civil protective order] should be permitted to enforce that order through an intrafamily *40 contempt proceeding." 642 A.2d at 1279.
Like Green, Wilson involved the enforcement of restraining orders issued by a court in a divorce action. The Tennessee supreme court held that neither "constitutional principle nor ethical standard automatically disqualifies the private attorney for the beneficiary of the order from prosecuting a contempt action for a violation of the order." 984 S.W.2d at 899. In part, the court reasoned that since the trial judge, and not the private attorney, is the one to determine whether a contempt action may proceed, there is little risk that a "defendant's liberty interest will be erroneously deprived" by allowing a litigant's private attorney to prosecute a contempt. Id. at 903. Second, the court pointed to the "tremendous fiscal and administrative burdens" that would result from a rule barring a party's attorney from prosecuting a criminal contempt in a family law case:
Contempt proceedings often arise in domestic relations cases in state courts. However, unlike the federal system, there is no fund in Tennessee from which to compensate private counsel appointed to prosecute civil contempt actions. It is unrealistic to expect district attorneys to prosecute contempt actions arising from alleged violations of civil court orders. District attorneys already have a heavy case load prosecuting violations of the general criminal laws. Were we to hold that due process precludes a litigant's private attorney from prosecuting contempt proceedings, many citizens would be deprived of the benefits to which they already have been adjudged entitled by state courts and many state court orders would remain unenforced.
Id. at 903 (citation and footnotes omitted).
Wilson also concluded that the ethical concerns which bothered the Supreme Court in Vuitton were not present in a family law contempt action. "Contempt of court is intended to vindicate a court's authority and to maintain the integrity of court orders." Id. at 904. "In a contempt proceeding alleging a violation of a court order, . . . the interest of the private litigant coincides with the interest of the court. The common goal is to force compliance with the court order." Id. The procedural safeguards of the rules of criminal procedure "ameliorate concerns that a private attorney will improperly institute a contempt proceeding in contravention of the interests of justice." Id. at 905. Criminal contempt proceedings in a family case are typically directed at offensive conduct, without the pecuniary aspect of the trademark infringement proceedings at issue in Vuitton.
We agree with the reasoning of Wilson and Green and decline to follow Gordon's suggestion that we align with the contrary view taken in Rogowicz v. O'Connell, 147 N.H. 270, 786 A.2d 841 (2001).
Because we are remanding for a new contempt hearing with appointed counsel, we do not dwell at length on Gordon's complaints about his sentence. We note that the time Gordon spent in jail from September 29, 2004 to October 5, 2004 was not a sentence that violates the rule that a defendant must serve his sentence in one stretch rather than in bits and pieces. See, e.g., Butler v. State, 548 So.2d 780 (Fla. 2d DCA 1989); Rozmestor v. State, 381 So.2d 324 (Fla. 5th DCA 1980). Rather, after the court found Gordon guilty of criminal contempt, it exercised its discretion under Florida Rule of Criminal Procedure 3.550 to have him taken into custody. See Harbaugh v. Cochran, 688 So.2d 1020 (Fla. 4th DCA 1997). We agree that Gordon was entitled to the assistance of court appointed counsel at the sentencing hearings. *41 Without deciding the issue, we note our concern with a sentencing proceeding that was based in part upon a defendant's conduct occurring after a finding of guilt; at a minimum, as with the statements in a presentence investigation, a defendant should have notice of the conduct that will be brought to the attention of the court and a fair opportunity to dispute facts presented by individuals seeking to influence the sentencing judge. See Fla. R.Crim. P. 3.713 (pertaining to disclosure of contents of presentence investigation reports to the parties); see also Doty v. State, 884 So.2d 547, 550 (Fla. 4th DCA 2004) (where court wrote that the "victim's testimony regarding appellant's violation of another domestic violence injunction obtained by a different woman was the type of allegation that the court should not have permitted in evidence [at a sentencing hearing]."); Reese v. State, 639 So.2d 1067 (Fla. 4th DCA 1994) (holding that "unsubstantiated allegations of misconduct may not be considered by a trial judge at a criminal sentencing hearing and to do so violates fundamental due process.").
Affirmed in part, reversed in part, and remanded.
WARNER, J., concurs.
POLEN, J., concurs in part and dissents in part with opinion.
POLEN, J., concurring in part and dissenting in part.
I agree with the majority's reversal in this case, but dissent with its disposition of the issue of whether the former wife's attorney was properly appointed to prosecute the charge of indirect criminal contempt. While the majority chooses to not apply the holding in Young v. United States ex rel. Vuitton et Fils S.A. in a state family law proceeding, I find it relevant and applicable to this case. 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).
The holding in Young is based on the conclusion that the attorney for a private client that has a financial interest in the outcome of the contempt proceedings should not be appointed as a special criminal contempt prosecutor, due to the concern that the attorney will not be as dispassionate as disinterested counsel. 481 U.S. at 803-04, 107 S.Ct. 2124. I believe this concern is entirely translatable to a family law case such as the one before us. Counsel in family law cases can become just as deeply involved as in cases involving greater financial matters.
While mindful of the majority's concerns regarding the factual complexity of the instant case and its lack of interest to a professional prosecutor, I would posit the trial court should have first appointed or attempted to appoint counsel from the State Attorney's office rather than bypassing this step entirely. If it became obvious that the State Attorney's office was lacking in manpower or ability to take the case, this would be the proper point for the trial court to appoint the former wife's attorney as a special prosecutor in the case. Therefore, I would reverse as well the trial court's failure to attempt appointment of a neutral prosecutor.
NOTES
[1] Explaining his work history to the judge, Gordon said, "I've never worked. As a younger man, I owned four vegetarian restaurants. I've never had a job where I have worked for somebody else. I always, for the last 17 years or so, I managed my family's money. First my mother and my own and my wife's. I was always able to earn enough money doing that. . . . [S]ince the separation more than two years ago, I've tried trading in the market. The market has been bad. Between attorney's fees, living expenses, child support, and bad stock market, my assets have dwindled to zero."
[2] For example, Gordon stated "I'm at the mercy of Ms. Savitt and Mr. Colin to say and do whatever they want. They've been doing it for three and a half years. None of the things they've ever predicted have ever come true . . . You can spend one day, one minute with me and my child and you would see how completely preposterous these allegations are . . . [I]n the tape recording you heard at the trial that you found me guilty of, those tape recordings had no threatening words in them. Yes I was angry. I said . . . I want to be an equal parent to my child but I in no way threatened Ms. Savitt. . . ."
[3] Gordon filed no motion for statement of particulars. See Fla. R.Crim. P. 3.840(b).
[4] We suspect that had an attorney been appointed for Gordon, see infra, the contempt proceeding would have had greater focus and direction.
[5] Justice Blackmun, in a concurring opinion, wrote that "the practicefederal or stateof appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process." Vuitton, 481 U.S. at 814-15, 107 S.Ct. 2124 (Blackmun, J., concurring).