# Third District Court of Appeal
## State of Florida

Opinion filed October 30, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-1135
Lower Tribunal No. 22-6441
_____

**Thomas Van Lent,**
Appellant,

vs.

**The Everglades Foundation, Inc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Carlos Lopez, Judge.

Rayboun Winegardner PLLC, Jennifer Winegardner and Michael C. Rayboun (Tallahassee), appellant.

Kozyak Tropin & Throckmorton, and Harley S. Tropin, Jorge L. Piedra and Michael R. Lorigas, for appellee.

Before SCALES, MILLER and GORDO, JJ.

GORDO, J.

Thomas Van Lent ("Van Lent") appeals a final judgment finding him guilty of indirect criminal contempt for violating the terms of a temporary injunction. We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(A). For the reasons that follow, we affirm.

**I.**

Van Lent was employed as a scientist at the Everglades Foundation, Inc. (the "Foundation"), a non-profit organization with a mission to restore the Everglades through science-based strategies. For more than thirty years, the Foundation has been positioned as one of the most influential players in the fight to preserve and protect Florida's wetlands. Critical to its mission is the Foundation's development of internal, proprietary scientific data and models.

Van Lent was hired by the Foundation in 2005 to engage in scientific and technical aspects of Everglades restoration, which included the protection and expansion of the Foundation's confidential projects. During his tenure, he was a member of the Foundation's Science Department and served various roles, including being head of the department. Van Lent was intimately involved in the Foundation's development of scientific positions to

2

support its mission.  In his various job duties, Van Lent built scientific models, analyzed data, co-authored publications and gave public and private presentations related to the Foundation's groundbreaking research.

Van Lent was also the internal information technology ("IT") administrator for the Foundation.  He oversaw the organization's IT infrastructure and worked with outside firms to store the work product he was paid to produce for the Foundation during his seventeen-year tenure.  Over the course of his employment, Van Lent had access to all the Foundation's servers, which contained highly confidential and sensitive proprietary information that was not made available to the public.  Importantly, Van Lent was involved in the purchase and deployment of these servers, was the main administrator of the servers, controlled and directed their usage and restricted other employees' access to them.

In 2015, the relationship between Van Lent and the Foundation began deteriorating.  Specifically, Van Lent opposed policy positions taken by the Foundation's chief executive officer, which escalated into a contentious disagreement.  As a result, Van Lent was demoted to a staff position without leadership responsibilities after the CEO "no longer felt he could trust Van Lent to speak on behalf of the Foundation."  In February 2022, Van Lent

resigned. Van Lent subsequently announced, via social media, that he would be working with the Friends of the Everglades, a rival organization of the Foundation Van Lent publicly commended as putting "facts over politics."

Prior to Van Lent's departure, and without authorization of the Foundation, Van Lent deleted hundreds of thousands of files from the Foundation's servers and downloaded copies of its confidential electronic data to take with him. According to a later conducted forensic examination, Van Lent additionally destroyed all the usable data on his Foundation-issued laptop and reset the machine to its factory default settings before returning it to the Foundation.[1]

After learning about all the confidential electronic data Van Lent had downloaded, transferred and then deleted from the Foundation's servers in the final weeks of his employment, the Foundation attempted to resolve its concerns out of court. The Foundation's efforts, however, proved unsuccessful. In April 2022, the Foundation filed a lawsuit against Van Lent asserting claims for breach of contract, conversion and misappropriation of

---

[1] Upon resignation or termination, Foundation employees are required to return to the Foundation all Foundation-owned devices, data and property.

4

trade secrets. Van Lent, represented by counsel, filed an answer and asserted affirmative defenses.

The Foundation then filed an ex parte motion for temporary injunction to prevent Van Lent from further destroying, copying and/or disseminating any Foundation-owned materials or confidential information. The trial court granted the temporary injunction on April 11, 2022. The injunction clearly and unequivocally ordered Van Lent to: (1) immediately cease use and disclosure of the Foundation's confidential information; (2) immediately return all Foundation materials to the Foundation; (3) immediately cease use or deletion of any materials on any computer equipment in his possession; and (4) deliver all computer equipment as well as certain specified devices and computer accounts to the Foundation's forensic examiner for inspection.

Van Lent did not comply with the trial court's order. The Foundation then moved to hold Van Lent in contempt.

While the contempt proceedings were ongoing, the parties began settlement discussions in June 2022 and ultimately entered into an agreed written settlement agreement and stipulated to the entry of a permanent injunction. By the terms of the agreement, Van Lent was permanently restrained, enjoined and prohibited from using or disclosing the Foundation's

5

confidential information to any other person or entity, including the rival organization he had begun working for. He was further obligated to deliver his electronic devices and the access credentials to his storage accounts to the Foundation's forensic examiner.

The forensic examination of Van Lent's devices and accounts in September 2022 revealed that after the trial court had issued the temporary injunction, Van Lent embarked on a massive data deletion campaign, during which he: (1) deleted over 760,000 items, including both user files and applications data, from his laptop, including materials belonging to the Foundation; (2) conducted Google searches relating to finding hidden files stored on a Mac computer; (3) deleted over 11,000 emails and email attachments; (4) deleted approximately 9,000 KeepIt files[2]; (5) used a data destroying program called CleanMyMac X to delete files from his laptop; (6) installed Hider Pro, an anti-forensics program that prohibits the ability to analyze or determine the contents of stored files, and then deleted the program the next day; (7) used a program called Encrypto to encrypt files and then deleted those files; and (8) reformatted a hard drive multiple times,

---

[2] KeepIt is an "organizational and data storage software program that provides users the ability to utilize cloud storage services to sync data across multiple devices."

erasing all data stored on the drive and leaving it devoid of any recoverable information.

The Foundation subsequently moved for an emergency order to show cause as to why Van Lent should not be held in indirect criminal contempt for violating the terms of the temporary injunction and in civil contempt for failing to comply with the court-approved settlement agreement. The trial court issued an order to show cause and set a hearing.

Pursuant to the requirements of Florida Rule of Criminal Procedure 3.840, the show cause order informed Van Lent of the nature of the indirect criminal contempt charge and notified him of his right to be represented by counsel. The order also appointed the Foundation's attorney to assist the trial court with the prosecution of the contempt charge. Van Lent and his attorneys did not object to this appointment. Van Lent then pleaded not guilty, and discovery ensued.[3] Importantly, Van Lent was represented by counsel at the show cause hearing and throughout the entirety of the contempt proceedings.

---

[3] Van Lent was afforded the opportunity to conduct reasonable discovery in support of his defense, which included deposing the Foundation's forensic examiner and having his devices and accounts made available for inspection.

7

On May 10 and 11, 2023, the trial court held a hearing on the allegations contained in the show cause motion. The Foundation's attorney called two witnesses, the forensic examiner and the Foundation's chief financial and operations officer. Van Lent's attorneys cross-examined both witnesses and called Van Lent in his defense. During his testimony, Van Lent readily admitted that he chose not to follow the terms of the temporary injunction.

After thoroughly weighing the evidence and testimony presented, the trial court issued a final judgment adjudicating Van Lent guilty of indirect criminal contempt for intentionally violating the temporary injunction and for hindering the administration of justice. This appeal followed.

**II.**

"A trial court's contempt judgment 'comes to the appellate court clothed with a presumption of correctness' which should not 'be overturned unless a clear showing is made that the trial court either abused its discretion or departed so substantially from the essential requirements of law as to have committed fundamental error.'" Rojo v. Rojo, 84 So. 3d 1259, 1261 (Fla. 3d DCA 2012) (quoting DeMello v. Buckman, 914 So. 2d 1090, 1093 (Fla. 4th DCA 2005)). "An appellate court will not disturb a trial court's factual findings

8

when supported by competent substantial evidence." Whitby v. Infinity Radio, Inc., 961 So. 2d 349, 354 (Fla. 4th DCA 2007).

### A. Indirect Criminal Contempt in Florida

"[T]he power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911). "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." Ex parte Robinson, 86 U.S. 505, 510 (1873). In Florida, "[i]t has long been recognized that courts have the authority to enforce a judgment by the exercise of their contempt powers." Parisi v. Broward Cnty., 769 So. 2d 359, 363 (Fla. 2000) (quoting Johnson v. Bednar, 573 So. 2d 822, 824 (Fla. 1991)). "The courts are granted this contempt authority because: '[t]he interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter.'" Id. (quoting U.S. v. United Mine Workers of Am., 330 U.S. 258, 303 (1947)).

"Criminal contempt proceedings are utilized to vindicate the authority of the court or to punish for an intentional violation of an order of the court." Bowen v. Bowen, 471 So. 2d 1274, 1277 (Fla. 1985). "Strictly speaking, criminal contempt proceedings are not criminal proceedings or prosecutions even though the act involved is also a crime." In re S.L.T., 180 So. 2d 374, 378 (Fla. 2d DCA 1965) (footnote omitted). "In criminal contempt proceedings the dominant purpose is punitive in nature." Id. "Its purpose is to preserve the power and vindicate the authority and dignity of the court and to punish for disobedience of its orders." Id. "Because this type of proceeding is punitive in nature, potential criminal contemnors are entitled to the same constitutional due process protections afforded criminal defendants in more typical criminal proceedings." Bowen, 471 So. 2d at 1277.

In Florida, indirect criminal contempt proceedings are governed by Florida Rule of Criminal Procedure 3.840.[4] To assist the trial court in conducting an indirect criminal contempt proceeding, Rule 3.840(d) expressly authorizes the trial court to appoint "the prosecuting attorney" or "an attorney appointed for that purpose." See Fla. R. Crim. P. 3.840(d) ("The

_____

[4] Rule 3.840 was enacted in 1968.

10

judge may conduct a hearing without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose."). In this context, the appointed attorney's involvement generally amounts to nothing more than "calling witnesses, conducting examinations, and making argument at a contempt hearing." Hudson v. Marin, 259 So. 3d 148, 165 (Fla. 3d DCA 2018). "[S]uch involvement assists a judge who might otherwise handle the hearing 'without assistance of counsel,' and be in the difficult position of both a 'quasi' prosecutor and judge, a situation sanctioned by contempt jurisprudence." Id. (quoting Fla. R. Crim. P. 3.840(d)). Notably, Florida courts have routinely upheld criminal contempt judgments secured with the assistance of the contemnor's opposing counsel. See Routh v. Routh, 565 So. 2d 709, 710 (Fla. 5th DCA 1990) ("We recognize the appointment by the court of the former wife's counsel to prosecute [the former husband] for criminal contempt and its authority to do so under Rule 3.840(a)(4),[5] Florida Rules of Criminal Procedure. That rule allows the trial judge to determine whether the judge will conduct the hearing without the assistance of counsel, whether the state attorney will assist the court, or whether an attorney will be appointed for that purpose.").

---

[5] Now Rule 3.840(d).

11

## B. The Contempt Hearing

On appeal, Van Lent argues the evidence presented at the contempt hearing was insufficient to establish his intent to violate the temporary injunction.

## 1. Forensic Examiner

At the contempt hearing, opposing counsel first called the forensic examiner as a witness. The forensic examiner testified that he performed a forensic analysis of Van Lent's devices, which included a MacBook Pro laptop and two hard drives, in September 2022 following the trial court's entry of the temporary injunction on April 11, 2022. The forensic examiner recounted the results of his examination of Van Lent's laptop, which included the following findings: (1) between August 17, 2022 and August 31, 2022, Van Lent deleted and removed over 700,000 items, including both user files and applications data, from his laptop; (2) Van Lent conducted Google searches relating to finding where files specifically were stored on a Mac computer; (3) around the time Van Lent conducted the Google searches, Van Lent deleted over 11,000 emails and email attachments from his laptop; (4) the following software programs were found on Van Lent's laptop: KeepIt,

Dropbox, Hider Pro,[6] Encrypto[7] and CleanMyMac X[8]; (5) Van Lent deleted 8,962 KeepIt files, the bulk of which were deleted between August 23, 2022 and August 24, 2022; (6) on August 22, 2022, Van Lent installed Hider Pro on his laptop, and then deleted the program, which prohibited any subsequent forensic analysis of the program; (7) between August 22, 2022 and August 24, 2022, Van Lent encrypted multiple files using Encrypto, and then deleted the encrypted files; and (8) Van Lent downloaded at least 79 documents from the Foundation's Google Workspace, which included highly confidential items like a board and staff directory, and then deleted those documents.

The forensic examiner then testified as to the results of the forensic analysis of one of Van Lent's hard drives. He testified that the hard drive was completely devoid of any recoverable information because it had been "reformatted" multiple times. Specifically, he testified there were at least

---

[6] Hider Pro is "considered to be an anti-forensic tool as it prohibits the ability to . . . determine the contents of a secured container."

[7] Encrypto is a "software application that's specifically designed for secure file transfers by allowing the user to encrypt data prior to sharing it with designated recipients."

[8] CleanMyMac X is a "commercially available data destruction software used to both clean up unwanted files, as well as perform the ability for the user to conduct manual wiping up data to prevent retrieval."

seven detectable instances where the hard drive went through the reformatting process. The forensic examiner then explained that the process of reformatting a hard drive destroys the electronic data stored within the drive, and that it is uncommon for a hard drive to be reformatted multiple times. He offered his opinion that the hard drive at issue was repeatedly reformatted to ensure that the data could not be recovered from past iterations of the drive. Lastly, the forensic examiner testified that based on his professional experience, the widespread data destruction that occurred just prior to Van Lent's remanding of his devices to the Foundation suggested "very specific and purposeful . . . steps to obscure user activity and usage of data."

### 2. Chief Financial and Operations Officer

Opposing counsel next called the Foundation's chief financial and operations officer. The CFO described in detail the Foundation and its mission and testified that the work performed by the Foundation's scientists is the exclusive property of the Foundation. She specifically stated, "the work they are performing is on our time, on our equipment, and is proprietary and owned by our Foundation." The CFO then recounted Van Lent's

employment history and spotlighted his role of initiating and leading the IT infrastructure at the Foundation.

The CFO reaffirmed the results of the forensic examinations of Van Lent's devices and testified to the Foundation's impression of Van Lent's conduct following the entry of the temporary injunction on April 11, 2022:

> The dates of these deletions, August 23rd, 24th, 25th, are exactly the days we were negotiating the final details of the settlement agreement. So he was obviously secretly working to remove data and files, and then went through the process of hiding his tracks so that we wouldn't recover that. So to me, that meant he had no intention of complying with the settlement agreement.

The CFO ultimately testified that the Foundation has been unable to recover all the data, documents, work product and confidential information Van Lent deleted. She additionally offered her opinion as to the effect Van Lent's conduct and the loss of seventeen years' worth of his work product has had on the Foundation and its progress in restoring the Everglades:

> Van Lent has had the longest tenure being the very first employee and had gone through many, many analyses, assumptions, disapprovals, and theories, that were critical to our work and our messaging. And so to not have that volume, that library of, you know, first we asked this question, then we found that answer. Then we looked at these questions, then we presented these solutions. To, to not have any of that, even today, our science team of seven

individuals, they cannot reference those talks. They can't reference those models, how those conclusions were drawn. I mean, it's an incredible gap for the organization to not be able to reference any of those materials that we paid for that were great – you know, done on our time, on our computers et cetera. So it puts us at a big, I'd say, intellectual and historical deficit.

### 3. Van Lent

Van Lent was called by his attorneys to testify in his own defense. On direct examination, Van Lent testified about his conduct in the weeks prior to the entry of the temporary injunction and after announcing his resignation from the Foundation. During his employment, Van Lent used his Foundation-issued laptop for both work and personal use. He testified that prior to returning the laptop to the Foundation upon his resignation, he reformatted the device to factory default settings, knowing that this process would delete everything contained on the device. He stated he performed this reformatting with the unconfirmed belief that all the Foundation's data had been previously returned to the Foundation. He further testified that he deleted data from the Foundation's servers, however, he stated that these deletions were only designed to clean up and organize the servers because there were many "redundant" and "duplicate" files.

Van Lent then responded to the allegations that he intentionally violated the terms of the temporary injunction. While Van Lent admitted to downloading the various data-destroying software programs and deleting electronic data, including files and emails, he maintained that he *only* did so to protect his personal privacy. He asserted that his only interest was "protecting my privacy and making sure, or doing my best to eliminate personal data." Despite the specific language of the temporary injunction that ordered Van Lent to "[i]mmediately cease use or deletion of **any** materials on any computer, hard drive, USB storage device, CD-ROM, DVD-ROM, or any other device or cloud storage location," Van Lent submitted that he "never interpreted" the injunction to include *all* data. Rather, he asserted his belief that this language was only in reference to "Everglades Foundation materials."

When pressed on cross-examination about his understanding of the temporary injunction, Van Lent repeatedly admitted he thought the terms of the injunction were clear. He further testified to his belief that because the underlying case against him was "faulty," he did not feel he had to comply with its terms:

> Q: So you made the decision not to follow the instructions of this temporary injunction, correct?

17

A: That was my decision, yes.

Q: And you made that decision because you thought Judge Lopez was wrong, correct?

A: I didn't – no, that is not correct. I did not believe Judge Lopez was wrong. However, I thought that the information presented to Judge Lopez was incorrect and faulty, and therefore the premise of the injunction was faulty. And I wanted the opportunity to get it reviewed and – before I complied.
. . .

Q: Okay. Okay, did you ever get a court order telling you, you did not have to comply with this provision?

A: No, I did not receive a court order telling me I did not have to comply.

Q: So from April, all the way through August, you ignored the provision in this order and disobeyed, which required you to return the LaCie Drive or send it to [the forensic examiner], correct?

A: Yes.
. . .

Q: So what you're saying is that as an American, you think you have the right to obey the orders that you are in agreement with, correct?

A: My understanding and my belief –

Q: That's a yes or no. You can give your understanding –

A: Yes.

18

In its contempt judgment finding Van Lent guilty of indirect criminal contempt, the trial court found Van Lent's testimony was not credible, expressly rejecting Van Lent's assertions that he did not believe the injunction's prohibition on deleting data applied to his personal data. Specifically, the trial court found Van Lent's testimony concerning his conduct following the entry of the temporary injunction—that he performed certain acts to ensure that none of his personal data was made available to the Foundation during the forensic examination of his devices and accounts—was not credible and that he intentionally violated the injunction. The trial court additionally found Van Lent independently intended to hinder the administration of justice.

We find the trial court's credibility findings are well-supported, particularly in a situation such as this where Van Lent testified that he knew the temporary injunction prohibited him from deleting *any* data from his devices and accounts, yet he chose to delete over 760,000 files and 11,000 emails, including Foundation materials. Given Van Lent's own testimony and the sheer amount of electronic data that was deleted in this case, we find ample competent substantial evidence for the trial court's findings that Van Lent did not simply delete personal information and instead intentionally

19

violated the temporary injunction by engaging in a scheme to misappropriate the Foundation's confidential information and conceal his misconduct. Moreover, the clear and unambiguous terms of the temporary injunction placed him on notice that he was not to delete *any* information of *any* kind— personal or otherwise. Because the record before us is replete with evidence that Van Lent intended to violate the trial court's order, we find the court did not abuse its discretion by finding Van Lent guilty of indirect criminal contempt. See Rojo, 84 So. 3d at 1261; Evans v. Thornton, 898 So. 2d 151, 152 (Fla. 4th DCA 2005) ("When the trial court's decision is based on live testimony, the appellate court defers to the trial court's determination as to the credibility of witnesses."); Sinclair v. Sinclair, 804 So. 2d 589, 592 (Fla. 2d DCA 2002) ("The trial court is in the best position to weigh the evidence and to determine the credibility of the witnesses, and it is not for this court to re-weigh the evidence or to substitute its judgment for that of the trial court."); Williams v. Nuno, 239 So. 3d 153, 155 (Fla. 3d DCA 2018) ("[A] trial court's factual determinations, including credibility determinations, are ordinarily not disturbed on appeal.").

### C. Appointment of Counsel to Assist in Prosecution

Van Lent raises for the first time on appeal[9] that the trial court committed fundamental error by appointing opposing counsel to assist in the prosecution of his indirect criminal contempt charge.

### 1. Fundamental Error

We begin our analysis with a basic tenet of Florida appellate review that it is improper to raise for the first time on appeal matters which should have been raised to the trial court. Generally, "'[t]he failure to object to error, even constitutional error, results in a waiver of appellate review' unless there

---

[9] While the concurrence raises thoughtful points, they are not germane to the case before us for the multitude of reasons discussed in the majority opinion. A fundamental principle of appellate law is that we review cases for error based on the facts and circumstances of the particular case being adjudicated. Here, although Van Lent and his attorneys postulate on appeal that opposing counsel had a "financial interest" in the outcome of the contempt proceedings, they never specifically raised the issue of attorney's fees in their briefs. We do not give advisory opinions, or address purely academic questions, so as not to vitiate due process of future litigants who wish to properly raise these arguments. See Rosier v. State, 276 So. 3d 403, 406-07 (Fla. 1st DCA 2019) ("An appellate court is 'not at liberty to address issues that were not raised by the parties' . . . Instead, an appellate court must confine its decision to the issues raised in the briefs. For an appellant to raise an issue properly on appeal, he must raise it in the initial brief. Otherwise, issues not raised in the initial brief are considered waived or abandoned. These fundamental principles of appellate review and judicial restraint apply even when the defendant has been convicted of a capital crime and sentenced to death." (quoting Anheuser-Busch Cos., Inc. v. Staples, 125 So. 3d 309, 312 (Fla. 1st DCA 2013))) (footnote omitted).

was fundamental error." Santisteban v. State, 306 So. 3d 359, 361 (Fla. 3d DCA 2020) (quoting D'Oleo-Valdez v. State, 531 So. 2d 1347, 1348 (Fla. 1988)).  "Fundamental error has been defined as 'error which goes to the foundation of the case or goes to the merits of the cause of action.'" Ray v. State, 403 So. 2d 956, 960 (Fla. 1981) (quoting Sanford v. Rubin, 237 So. 2d 134, 137 (Fla. 1970)).  "For an error to be so fundamental that it can be raised for the first time on appeal, the error must be basic to the judicial decision under review and equivalent to a denial of due process." Hopkins v. State, 632 So. 2d 1372, 1374 (Fla. 1994) (quoting State v. Johnson, 616 So. 2d 1, 3 (Fla. 1993)).  Appellate courts "have been cautioned to exercise their discretion concerning fundamental error 'very guardedly.'" Ray, 403 So. 2d at 960 (quoting Sanford, 237 So. 2d at 137).

## 2. Due Process

In support of his fundamental error argument, Van Lent contends the appointment resulted in a violation of his due process rights.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

22

Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950). "The guarantee of due process under the Florida Constitution contemplates that the defendant shall be given fair notice and afforded a real opportunity to be heard and defend in an orderly procedure, before judgment is rendered against him." S.J. v. Dep't of Child. & Fams., 337 So. 3d 78, 80 (Fla. 3d DCA 2021) (internal quotation marks and citation omitted). Florida Rule of Criminal Procedure 3.840 provides the procedural safeguards for indirect criminal contempt proceedings in Florida. Specifically, Rule 3.840(a) requires that a trial court's show cause order state the essential facts constituting the contempt charged. See Fla. R. Crim. P. 3.840(a). Rule 3.840(d) mandates that a hearing to determine the guilt or innocence of the alleged criminal contemnor follow a plea of not guilty, and that the alleged criminal contemnor is "entitled to be represented by counsel, have compulsory process for the attendance of witnesses, and testify in his or her own defense." See Fla. R. Crim. P. 3.840(d). Rule 3.840(f) sets forth that a judgment of guilty recite the facts constituting the contempt. See Fla. R. Crim. P. 3.840(f).

Here, it is undisputed that Van Lent received notice and a meaningful opportunity to be heard at all stages of the contempt proceedings. The trial

23

court's show cause order set forth the essential facts constituting the indirect criminal contempt charge, Van Lent was represented by counsel throughout the entirety of the proceedings, he was given an opportunity to conduct discovery in support of his defense, he received a full hearing during which he testified and his attorneys cross-examined the Foundation's witnesses and the trial court's final contempt judgment detailed the facts constituting the contempt. Because the trial court strictly complied with the requirements of Rule 3.840[10] and Van Lent otherwise received all the procedural protections of notice and an opportunity to be heard, we find no constitutional due process deprivation occurred. See Thomas v. Cromer, 276 So. 3d 69, 72 (Fla. 3d DCA 2019) ("A trial court 'provides due process if the complaining party was given notice and an opportunity to be heard.'" (quoting Nationstar Mortg., LLC v. Weiler, 227 So. 3d 181, 183 (Fla. 2d DCA 2017))).

---

[10] Perhaps the concurrence hopes to initiate a discussion as to whether a rule change should be considered. That may be a valid question for a different day. It is worth noting, however, the practical effects of placing the responsibility on state attorneys to prosecute every contempt action arising from an alleged violation of a civil court order. It is unrealistic to expect state attorneys, who already have a heavy case load prosecuting violations of the general criminal laws, to prosecute criminal contempt proceedings. As recognized by courts of our sister states, "tremendous fiscal and administrative burdens would result from a substitute procedural requirement," and "many state court orders would remain unenforced." Wilson v. Wilson, 984 S.W.2d 898, 903 (Tenn. 1998).

### 3. The Young Decision

To further support his argument that the appointment of opposing counsel amounted to fundamental error, Van Lent relies on Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987) (plurality opinion). In Young, pursuant to its supervisory powers, the United States Supreme Court was reviewing the prosecution of a criminal contempt, pursuant to Federal Rule of Criminal Procedure 42(b), by private counsel for the plaintiff who had been appointed by the district court for that purpose. Young, 481 U.S. at 791-92.

Young began as a trademark infringement action brought by the plaintiff, Louis Vuitton, against several businesses which were manufacturing and selling imitations of the French manufacturer's leather goods. Id. at 790. Under an agreement which settled the infringement case, the defendants agreed to pay damages and consented to the entry of a permanent injunction prohibiting them from using Louis Vuitton's registered trademark. Id. at 790-91. Relevant to this appeal, the district court appointed Louis Vuitton's attorneys as special prosecutors to investigate and prosecute the defendants' alleged violation of the injunction. Id. at 791-92. Significantly, the appointment was made pursuant to Federal Rule of Criminal Procedure 42, which conferred upon Louis Vuitton's attorneys the full and plenary

powers ordinarily possessed by a United States prosecutor, however, the United States Attorney's Office took no part in the prosecution of the case. Id.

As special prosecutors, Louis Vuitton's attorneys subpoenaed hundreds of audio and video tapes of meetings and ordered wiretapped telephone conversations between the defendants and investigators. Id. at 792. With that evidence, the special prosecutors requested and obtained an order from the district court directing the defendants to show cause why they should not be held in contempt for violating the court's injunction. Id. The defendants filed motions opposing the show cause order and the appointment of the special prosecutors, which were later denied. Id. Two of the defendants subsequently entered guilty pleas, and several others were tried and convicted of criminal contempt. Id. The Court of Appeals for the Second Circuit affirmed the convictions. Id. at 793.

In announcing its decision that the district court reversibly erred by appointing Louis Vuitton's attorneys as special prosecutors, a four-justice plurality of the Supreme Court was primarily concerned with the conflicts that may arise when an interested party undertakes to prosecute a criminal contempt case, having all the plenary powers and resources of the United

States government at its disposal.  Id. at 803-09.  While we recognize the concerns raised in Young, we do not find those concerns implicated or determinative here.

### i. Young Did Not Implicate Due Process Concerns

As an initial matter, we note that the Supreme Court did not decide Young based on due process considerations[11] but instead as an exercise of its supervisory authority over the lower federal courts.  Young, 481 U.S. at 790 ("We now reverse, exercising our supervisory power . . . ."); id. at 809

---

[11] As Florida courts have explicitly recognized, the Young decision was grounded in the Supreme Court's supervisory powers, not due process.  See Gordon v. State, 960 So. 2d 31, 37 (Fla. 4th DCA 2007) ("[Young] does not establish a due process test for prosecutorial conflicts in criminal contempt cases.") (footnote omitted).  The plurality in Young did not join in Justice Blackmun's concurring opinion, wherein he wrote that "the practice—federal or state—of appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process."  Young, 481 U.S. at 814-15 (Blackmun, J., concurring).  Notably, no other justice joined Justice Blackmun's concurrence.  As such, any argument that Young established a due process bar to the private prosecution of criminal contempt by a party's civil opponent is misplaced.  See Am. Bankers Mgmt. Co., Inc. v. Heryford, 885 F.3d 629, 638 (9th Cir. 2018) ("[T]he [Young] decision was grounded in the Court's 'supervisory power,' not due process." (quoting Young, 481 U.S. at 790)) (footnote omitted); Webber v. Scott, 390 F.3d 1169, 1175 n.3 (10th Cir. 2004) ("In reversing the contempt convictions because of the appointment of the private prosecutors, the Supreme Court [in Young] relied on its supervisory authority and not on federal constitutional law.  In addition, three Justices specifically disagreed that the appointment of an interested prosecutor amounted to structural error.").

27

n.21 ("[W]e rely on our supervisory authority to avoid the necessity of reaching any constitutional issues."); id. at 826 (Powell, J., concurring in part and dissenting in part) ("Here, the error is not of constitutional dimension."). Because Young was an exercise of the Supreme Court's supervisory powers and not a determination of constitutional requirements, it does not bind us here. See Scoggins v. State, 726 So. 2d 762, 764-65 (Fla. 1999).

### ii. Federal Rule of Criminal Procedure 42 versus Florida Rule of Criminal Procedure 3.840

There are many practical differences between the federal judicial system and the courts of this State. Grave differences exist in the powers associated with a special prosecutor's appointment under Federal Rule of Criminal Procedure 42 and those associated with a private attorney's limited appointment under Florida Rule of Criminal Procedure 3.840. A special prosecutor appointed under Rule 42 to prosecute contempt exercises the same federal prosecutorial power granted to United States prosecutors. See U.S. v. Donziger, 38 F.4th 290, 298 (2d Cir. 2022) (stating that special prosecutors are analogous to independent counsel, who have "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice and the Attorney General") (citation omitted); U.S. v. Arpaio, 906 F.3d 800, 809 n.7 (9th Cir.

28

2018) (Callahan, J., dissenting from denial of reconsideration en banc) (providing that "[a] special prosecutor appointed under Rule 42 to prosecute contempt necessarily has the same, or at least similar, prosecutorial powers" to other special prosecutors whose powers include "conducting proceedings before grand juries and other investigations, making applications to any Federal court for warrants, subpoenas, or other court orders, and initiating and conducting prosecutions in any court of competent jurisdiction, framing and signing indictments, filing informations, and handling all aspects of any cases, in the name of the United States") (quotation marks and citation omitted). In contrast, a private attorney appointed under Florida's Rule 3.840—for the purpose of assisting the trial court with the prosecution of an indirect criminal contempt charge—does not claim the broad powers associated with a special prosecutor. They cannot employ "police investigation and interrogation, warrants, informers and agents whose activities are immunized, authorized wiretapping, civil investigatory demands, [or] enhanced subpoena power." Young, 481 U.S. at 811 (citation omitted). Instead, these appointed attorneys are limited to calling witnesses and presenting evidence at a contempt hearing. See Gordon, 960 So. 2d at 37 ("Although [the trial court] appointed [opposing counsel] as a 'prosecutor,'

29

the effect of his order was to appoint [opposing counsel] to 'assist' the court within the meaning of Rule 3.840(d) by calling witnesses at the contempt hearing. This was not a case where the court's order bestowed on [opposing counsel] all the powers of a prosecutor.").

In this case, unlike the attorneys appointed as special prosecutors in Young, who were granted expansive prosecutorial powers, opposing counsel was appointed within the meaning of Rule 3.840. Under this limited appointment, opposing counsel was not given the "power to employ the full machinery of the state in scrutinizing any given individual." Young, 481 U.S. at 814. Rather, he merely "call[ed] witnesses, conduct[ed] examinations, and ma[de] argument" at the contempt hearing, without any objection by a party fully represented by counsel. Hudson, 259 So. 3d at 165. Because it is uncontroverted that opposing counsel was not given the extraordinary and plenary powers of a special prosecutor in prosecuting Van Lent, and Van

Lent and his attorneys did not object to the appointment below, we conclude that Young is inapplicable to the circumstances presented here.[12]

<hr>

[12] Many of our sister courts have also found the concerns implicated in Young inapplicable in state court contempt proceedings. See Wilson, 984 S.W.2d at 905 ("[N]o constitutional principle nor ethical standard automatically disqualifies a private attorney representing the beneficiary of a court order from simultaneously prosecuting a contempt action which alleges a violation of the order."); People v. Vasquez, 39 Cal.4th 47, 45 Cal.Rptr.3d 372, 137 P.3d 199, 207 (2006) ("Defendants' reliance on [Young] for the proposition that participation of an interested prosecutor universally or generally infringes due process suffers from a fatal flaw: [Young] was decided not on constitutional grounds but under the United States Supreme Court's supervisory powers over the lower federal courts . . . [Young] stands as an example of how external influences might affect discretionary prosecutorial decisionmaking, but does not establish a due process test for prosecutorial conflicts."); DeGeorge v. Warheit, 276 Mich.App. 587, 741 N.W.2d 384, 392 (2007) ("The Court's holding in *Young* was based on the Court's supervisory authority over federal district and appeals courts. The United States Supreme Court's supervisory power does not extend to state courts. Therefore, the holding in *Young* does not control the present state criminal contempt proceeding."); Eichhorn v. Kelley, 111 P.3d 544, 547 (Colo. App. 2004) ("Because the ruling was an exercise of the Court's supervisory authority and not a determination of constitutional requirements, *Young* does not apply to state court contempt proceedings. Therefore, we conclude that the holding in *Young* did not preclude [appellees'] counsel from prosecuting the proceedings on remand."); State v. Galindo, 315 Neb. 1, 994 N.W.2d 562, 599-600 (2023) ("[Young] was not decided based on the Due Process Clause, but on the Court's supervisory power over contempt proceedings. Further, the portion of [Young] finding structural error . . . was not joined by a majority of the Court. While the foregoing facts persuade us that [Young] is not binding in this case, even if it were, we believe the facts here are distinguishable."); Pabst v. State, 287 Kan. 1, 192 P.3d 630, 637 (2008) ("While the argument that concurrently serving two masters is a per se violation of defendant's due process rights has surface appeal, it dissipates upon closer scrutiny."); Cronan ex rel. State v. Cronan, 774 A.2d 866, 877

### III.

We find ample competent substantial evidence to support the trial court's finding that Van Lent intentionally violated its order. The court acted well within its contempt powers to punish Van Lent and vindicate its authority based on Van Lent's egregious violation of the temporary injunction. Van Lent was afforded full due process and has not established that the appointment of opposing counsel in this case amounted to fundamental error.

In Florida, courts must have the ability to enforce their own orders. See Parisi, 769 So. 2d at 363 ("It is essential that our courts have the judicial power to enforce their orders; otherwise, judgments are only advisory. If a party can make oneself a judge of the validity of orders issued by trial courts, and by one's own act of disobedience set them aside, then our courts are devoid of power, and the judicial power, both federal and state, would be a mockery." (quoting Johnson v. Bednar, 573 So. 2d 822, 824 (Fla. 1991))). We emphasize that neither Van Lent nor any party is above the law. So long

---

(R.I. 2001) ("[G]iven the historical and statutory pedigree of private prosecutions in this state, as well as the particular procedural posture of this case, we decline to exercise our supervisory powers to establish a *per se* rule prohibiting private prosecutions like this one.").

as a court's criminal contempt findings are supported by competent substantial evidence and a defendant is afforded full due process, as was done here, a contempt judgment shall be afforded its presumption of correctness. Accordingly, we affirm the contempt judgment under review in all respects.

Affirmed.

MILLER, J., concurring dubitante.

I concur in dubitante with the majority on the issue of whether appointing counsel for the beneficiary of a civil court order to concurrently prosecute an indirect criminal contempt charge arising out of a violation of that order is consistent with due process. My doubt stems not from the majority's analysis but from the unclear status of the law in this area. It seems to me that this type of appointment may constitute structural error, but given that Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987), and its progeny are not binding upon us and no Florida court has yet disavowed this practice, I concur in the result reached by the majority.

**I.**

"No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." Amend. XIV, § 1, U.S. Const.; see also Art. I, § 9, Fla. Const. "While this tenet is so deeply ingrained in our jurisprudence that citation to authority is a mere formality, '[f]or all its consequence, "due process" has never been, and perhaps can never be, precisely defined.'" I.T. v. Dep't of Child. and Fams., 338 So. 3d 6, 9 (Fla. 3d DCA 2022) (alteration

in original) (quoting <u>Lassiter v. Dep't of Soc. Servs. of Durham Cnty.</u>, 452 U.S. 18, 24 (1981)). Instead, courts have recognized that "due process is flexible and calls for such procedural protections as the particular situation demands." <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972).

## II.

In Florida, it is well-settled that "[a] denial of due process, if proven, constitutes fundamental error, which may be challenged for the first time on appeal." <u>Verizon Bus. Network Servs., Inc. ex rel. MCI Commc'ns, Inc. v. Dep't of Corrs.</u>, 988 So. 2d 1148, 1151 (Fla. 1st DCA 2008). Indeed, some appellate courts have observed there is an "'unrenunciable judicial duty' to correct fundamental error even if it is not raised." <u>Hendricks v. State</u>, 34 So. 3d 819, 828 (Fla. 1st DCA 2010); <u>see</u> <u>Bain v. State</u>, 730 So. 2d 296, 302 (Fla. 2d DCA 1999) ("[T]he correction of fundamental error is not merely a judicial power; it is an unrenunciable judicial duty.").

## III.

"The power of courts to punish contempts is one which wends historically back to the early days of England and the crown." Ronald Goldfarb, <u>The Hist. of the Contempt Power</u>, 1961 Wash. U. L. Q. 1, 6 (1961). "The power . . . is inherent in all courts; its existence is essential to the

preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." Ex parte Robinson, 86 U.S. 505, 510 (1873). In this regard, it "derives from the court's power of self-preservation as an institution of government." Louis S. Raveson, Advoc. and Contempt: Const. Limitations on the Jud. Contempt Power Part One: The Conflict Between Advoc. & Contempt, 65 Wash. L. Rev. 477, 486 (1990).

Such power is not boundless. Courts have long observed that "the contempt power . . . is [uniquely] 'liable to abuse.'" Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994) (quoting Bloom v. Illinois, 391 U.S. 194, 202 (1968)); see also In re Terry, 128 U.S. 289, 313 (1888); Bagwell, 512 U.S. at 831 ("[I]ts fusion of legislative, executive, and judicial powers 'summon forth . . . the prospect of the most tyrannical licentiousness.'") (quoting Young, 481 U.S. at 822 (Scalia, J., concurring in judgment)). Consistent with ideals of judicial restraint, courts should strive to invoke only "the least possible power adequate to the end proposed." See Anderson v. Dunn, 19 U.S. 204, 231 (1821) (discussing legislative power); Young, 481 U.S. at 801 (applying Anderson's restraint principle to judicial authority to initiate criminal contempt prosecutions).

Because criminal contempt is punitive rather than coercive, it is "a crime in the ordinary sense . . . ." Bloom, 391 U.S. at 201. This means that "potential criminal contemnors" must receive "the same constitutional due process protections afforded criminal defendants in more typical criminal proceedings." Bowen v. Bowen, 471 So. 2d 1274, 1277 (Fla. 1985). A due process guarantee in this context comports "with our historic notions of elementary fairness." Taylor v. Hayes, 418 U.S. 488, 500 (1974).

## IV.

In Florida, criminal contempt proceedings are controlled by Florida Rule of Criminal Procedure 3.840(d), which provides that "[t]he judge may conduct a hearing without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose." In such circumstances, an appointed attorney "stand[s] in the shoes of the state . . . ." Cronan ex rel. State v. Cronan, 774 A.2d 866, 877 (R.I. 2001); see also Andrew Sidman, The Outmoded Concept of Priv. Prosecution, 25 Am. U. L. Rev. 754, 774 (1976) ("[The private prosecutor] becomes, in effect, a temporary public prosecutor."). This is because "[a] private citizen cannot criminally prosecute anyone," Trump v. United States, 144 S. Ct. 2312, 2348 (2024) (Thomas, J., concurring), and criminal court should not "be used for

37

private feeds" or "tit-for-tat 'justice,'" see In re Taylor, 73 A.3d 85, 89 (D.C. 2013).

## V.

The use of private prosecutors in criminal contempt proceedings has been the subject of close judicial scrutiny. In the landmark case of Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987), the United States Supreme Court considered whether counsel for the beneficiary of a court order could be properly appointed to prosecute a contempt action alleging a violation of that order. Young began as a trademark infringement action filed by the leather purveyor Louis Vuitton against several businesses selling counterfeit products. See id. at 790. The parties entered into an agreed injunction pursuant to a settlement agreement, and Vuitton later contended the injunction had been violated. See id. at 790–91. At Vuitton's request, the trial court issued an order to show cause and appointed Vuitton's attorney in the civil suit to serve as a private prosecutor for purposes of the contempt proceedings. See id. at 791.

The defendants unsuccessfully opposed the appointment. Some then entered guilty pleas, while others were found in contempt of court. See id. at 792. A series of appeals ensued, and the defendants raised two grounds

for reversal before the Supreme Court. See id. at 793. First, they alleged the trial court was entirely without authority to appoint a private attorney to prosecute the contempt charge. See id. Second, they contended that the appointment of an attorney representing the beneficiary of a court order to prosecute a criminal contempt action premised upon a violation of the order was improper. See id. at 802–09.

Observing that "courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt," the Supreme Court squarely rejected the first argument. Id. at 793. The Court cautioned, however, that the appointment power should be exercised sparingly and ordinarily only after the public prosecutor has denied the request to prosecute. See id. at 801.

As to the second argument, the Court observed that any private attorney appointed to prosecute an indirect criminal contempt charge should be as impartial as a public prosecutor. See id. at 804. This is because the attorney is appointed solely to pursue the public interest in vindicating the court's authority. Id. In a case where the private prosecutor continues to

represent an interested party, ethical constraints impede the attorney's ability to perform the prosecutorial function.  Id.

To guard against this conflict, the Court imposed a bright-line rule "that counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order."  Id. at 809.  The Court eschewed a harmless error analysis because it was unconcerned with actual prejudice.  See id. at 809–10; see also id. at 809 n.21.  It instead reasoned that appointing a private prosecutor with this type of extraneous interest "create[s] at least the *appearance* of impropriety."  Id. at 806.

Justice Scalia concurred with the majority opinion.  In his view, the appointments were defective because federal courts are not constitutionally empowered to punish contemnors for disobeying court judgments.  Id. at 825 (Scalia, J., concurring).  Further, because the broad discretion afforded to public prosecutors ordinarily renders decisions not to prosecute unreviewable, it was impossible to conclude the "prosecutions would have been brought had the court simply referred the matter to the Executive Branch."  Id.

## VI.

In the aftermath of <u>Young</u>, Florida courts have struggled with the constitutional contours of using court-appointed private prosecutors in criminal contempt proceedings. This is because <u>Young</u> was not decided on constitutional grounds and instead hinged strictly upon the Court's supervisory role over the lower federal courts. <u>See</u> <u>id.</u> at 802 (majority opinion). Consequently, its holding does not bind state courts. <u>See</u> <u>Scoggins v. State</u>, 726 So. 2d 762, 764 (Fla. 1999).

Our high court has yet to weigh in on the issue, but several decisions are instructive. Florida appellate courts have uniformly embraced the unremarkable proposition that criminal contempt proceedings "should . . . not inure to the benefit of a private individual." <u>See, e.g.</u>, <u>Routh v. Routh</u>, 565 So. 2d 709, 710 (Fla. 5th DCA 1990); <u>cf.</u> <u>State v. Williams</u>, 623 So. 2d 462, 464 (Fla. 1993) ("The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.") (quoting <u>State v. Glosson</u>, 462 So. 2d 1082, 1085 (Fla. 1985)). Indirect criminal contempt proceedings are purposed to vindicate the authority of the court. <u>See</u> <u>Aburos v. Aburos</u>, 34 So. 3d 131, 136 (Fla. 3d

DCA 2010). Hence, while private interests may be tangentially implicated, the proceedings remain between the accused and the public. See U.S. ex rel. Shell Oil Co. v. Barco Corp., 430 F.2d 998, 1002 n.8 (8th Cir. 1970). Thus, conferring a benefit upon a private party "improperly skews the decision[-]making process," Dowis v. State, 578 So. 2d 860, 861 (Fla. 5th DCA 1991), and awarding attorney's fees in criminal contempt proceedings is therefore impermissible, see Burlinson v. Wilson, 388 So. 3d 15, 16 (Fla. 4th DCA 2024) (finding fees are "not authorized in indirect criminal contempt proceedings"); Fredericks v. Sturgis, 598 So. 2d 94, 96 (Fla. 5th DCA 1992) ("[A]n award of attorney's fees for another party or a court's wasted time in a criminal contempt proceeding is improper.").

At least one Florida appellate court has declined to categorically prohibit the use of interested private prosecutors in criminal contempt proceedings stemming from family and domestic disputes. In Gordon v. State (Gordon I), 960 So. 2d 31 (Fla. 4th DCA 2007), rev'd 967 So. 2d 357 (Fla. 4th DCA 2007) (Gordon II), the Fourth District Court of Appeal confronted the issue of "whether appointment of a party's attorney to organize and present evidence at a criminal contempt . . . hearing [is] barred in all cases." Gordon II, 967 So. 2d at 358. The well-reasoned majority

42

opinion, authored by Judge Gross and joined by Judge Warner, pragmatically observed that "orders in family or domestic violence cases are different than the injunction at issue in [Young]." Gordon I, 960 So. 2d at 39. The court cogently expounded as follows:

> Although the public has an interest in an order entered in a family law or domestic violence case, this interest is far outweighed by the interest of the party seeking the enforcement or protection of the order. The public interest in the authority or dignity of a court is abstract; a litigant's interest in receiving child support or being free from physical harm or harassment is real and immediate. For this reason, the law should not preclude such parties from using their own attorneys to prosecute indirect criminal contempts. To require the appointment of an independent prosecutor in all cases would inject delay and additional expense into proceedings where litigants are often of limited means. Although an indirect criminal contempt proceeding in a family law case is vitally important to the parties, such a case often has little interest to a professional prosecutor.

Id.

The Gordon I majority further noted that criminal contempt proceedings in family and domestic cases do not implicate the same "pecuniary" concerns at issue in Young. Id. at 40. Therefore, it concluded that a categorical prohibition on interested prosecutors would be impractical and requiring "the appointment of an independent prosecutor in all cases would nullify a remedy provided in the domestic violence statute." Id. at 38–40; see also § 741.30(9)(a), Fla. Stat. (2024) ("The court may enforce a violation of an

43

injunction for protection against domestic violence through a civil or criminal contempt proceeding, or the state attorney may prosecute it as a criminal violation under s. 741.31."). Thus, the court declined to invalidate the appointment. Gordon I, 960 So. 2d at 38–40.

Judge Polen concurred in part and dissented in part, writing,

> The holding in Young is based on the conclusion that the attorney for a private client that has a financial interest in the outcome of the contempt proceedings should not be appointed as a special criminal contempt prosecutor, due to the concern that the attorney will not be as dispassionate as disinterested counsel. I believe this concern is entirely translatable to a family law case such as the one before us. Counsel in family law cases can become just as deeply involved as in cases involving greater financial matters.

Id. at 41 (Polen, J., concurring in part and dissenting in part) (internal citations omitted). He therefore reasoned that the trial court should have first sought appointment of a public prosecutor. Id.

The Gordon court later denied rehearing but granted clarification at the urging of the State. See Gordon II, 967 So. 2d at 357–58. In doing so, the court observed the potential for abuse of the prosecutorial power in certain cases, noting,

> There is a great difference between an "appointed" prosecutor who develops facts to support a finding and one who misuses the appointment for injustice and oppression. The record in this case contains facts which support the latter conclusion . . . . This

44

case did not review a trial court's refusal to remove an abusive and oppressive prosecutor; it addressed the question of whether appointment of a party's attorney to organize and present evidence at a criminal contempt at a hearing was barred in all cases.

Id. at 358.

As observed in Gordon I, other courts have taken a similar approach. See Green v. Green, 642 A.2d 1275, 1279–80 (D.C. 1994) (use of private prosecutor in intrafamily criminal contempt proceeding "does not present the potential for discovery abuses and financial conflicts of interest the Young Court addressed" due to constraints imposed by applicable rules); Wilson v. Wilson, 984 S.W.2d 898, 905 (Tenn. 1998) ("[A]llowing an attorney for the beneficiary of a court order [in a domestic case] to prosecute a contempt proceeding alleging a violation of that order does not involve an inherent or potential conflict of interest sufficient to warrant adoption of an automatic rule of disqualification."); but see In re Jackson, 51 A.3d 529, 540 (D.C. 2012) ("Because of the potential for conflicts in representation prohibited by professional responsibility rules, other ethical considerations, and the frequently diverging interests of a disinterested prosecutor and an attorney who is loyal to and an advocate for a private client, we conclude that trial judges should avoid appointing either the attorney for the beneficiary of a

[civil protection order ("CPO")], or a public attorney who has conflicting interests, to prosecute an indirect criminal contempt proceeding against the alleged violator of a CPO in intrafamily offense cases.").

**VII.**

The case at hand, of course, does not trace its origins to an intrafamily dispute. It instead arises from a civil injunction, and "[r]ecognizing the persuasiveness of Young's reasoning that private prosecution by interested parties presents fundamental concerns, the majority of state high courts to consider the issue have applied the Young standard either in their supervisory roles or have concluded that due process requires it." In re Paul, No. 23-0253, 2024 WL 1122520, at *3 (Tex. Mar. 15, 2024) (Bland, J., dissenting) (footnotes omitted), cert. denied sub nom. Paul v. Roy F. Found., No. 23-1313, 2024 WL 4486365 (U.S. Oct. 15, 2024). This is consistent with the concerns expressed by several justices of the Supreme Court over private prosecutions by interested parties, In re Paul, 2024 WL 1122520, at *4; see also Robertson v. U.S. ex rel. Watson, 560 U.S. 272, 273 (2010) (Roberts, C.J., dissenting) ("The terrifying force of the criminal justice system may only be brought to bear against an individual by society as a whole, through a prosecution brought on behalf of the government."); Donziger v.

46

<u>United States</u>, 143 S. Ct. 868, 869 (2023) (Gorsuch, J., dissenting, joined by Kavanaugh, J.) (discussing constitutional issues implicated in use of private prosecutor in contempt proceedings), and this court's observation in <u>Hudson v. Marin</u>, 259 So. 3d 148, 165 (Fla. 3d DCA 2018), that "there are circumstances where trial counsel is incapable of assisting the trial court in the manner contemplated by rule 3.840(d) . . . ."

Here, as in <u>Young</u>, the Foundation was the beneficiary of the temporary injunction underlying the criminal contempt charge and the driving force behind the commencement of contempt proceedings. It stood to avoid its monetary obligations under the settlement agreement and, because the civil and criminal proceedings were conducted together, recoup a significant sum of attorney's fees by operation of a contempt judgment. Although the breadth of the investigation in <u>Young</u> far eclipsed that apparent in this case, the private prosecutor remained dutybound to zealously advocate for the interests of his client while simultaneously seeking justice on behalf of the public. Dr. Van Lent persuasively argues these dueling roles were incompatible.

The majority reasons that <u>Young</u> and its progeny are distinguishable because Federal Rule of Criminal Procedure 42 confers substantially

47

broader prosecutorial authority than its Florida counterpart, and, in any event, the procedural safeguards set forth in Florida Rule of Criminal Procedure 3.840 are adequate to dispel any constitutional concerns. Although there is indeed a slight textual variance between the two provisions, it is axiomatic that rules cannot abrogate constitutional protections. See State v. Garcia, 229 So. 2d 236, 238 (Fla. 1969) ("The rules adopted by the Supreme Court are limited to matters of procedure, for a rule cannot abrogate or modify substantive law."). Rule 3.840 does not purport to address whether an interested prosecutor can constitutionally perform the rule-based function. Thus, the variation between the two rules does not satisfy the due process inquiry.

In my view, the pressure of wearing these two diametrically opposed hats arguably militated against the appointment at its inception. The United States Court of Appeals for the Fifth Circuit cogently explained in a decision predating Young:

> As we look objectively at this record there is no doubt concerning the genesis of this due process deficiency. It flows directly from the fact that the governance of the whole criminal contempt proceeding was delivered into the hands of counsel for private parties, not the National Sovereign. This transcends the matter of competence, character and professional trustworthiness. Indeed, it is the highest claim on the most noble advocate which causes the problem—fidelity, unquestioned, continuing fidelity to

48

the client. For while we would readily agree on this record that none of these distinguished counselors would have perverted a demand of the law in the prosecution of these respondents simply because it was detrimental to the interest of their railroad clients, the fact is that, continuing as they are in the related merits[] case . . . to the vigorous support of the Carriers' positions, they have a duty faithfully to assert every—the word is every—contention, refute every—the word is every—counter contention which they may legitimately and honorably do, which is disadvantageous to their carrier clients in this controversy. One such objective is to marshal and generate—through court orders if obtainable—pressures which will, or may, bring the Brothe[r]hood earlier to book. To move fast, to get punitive orders which might put the Brotherhood in an awkward or disadvantageous position was therefore a desired goal . . . . On the other hand, as prosecutors for the court[]—i.e. the National Sovereign—there was an obligation to make sure that the respondents' rights were scrupulously preserved. . . . The point is that those conflicting claims of undivided fidelity present subtle influences on the strongest and most noble of men. The system we prize cannot tolerate the unidentifiable influence of such appeals.

Bhd. of Locomotive Firemen & Enginemen v. United States, 411 F.2d 312, 319 (5th Cir. 1969) (footnote omitted).

**VIII.**

But Dr. Van Lent did not object, and whether such an appointment offends due process is not entirely clear. As previously indicated, Young was not decided on constitutional grounds and only a plurality concluded that the appointment was fundamentally flawed and the resultant harm was incapable of quantification. See 481 U.S. at 811–12; cf. Offutt v. United

49

<u>States</u>, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").

No Florida court has yet adopted this rationale, and it stands to reason that appointing opposing counsel to assist in criminal contempt proceedings is both convenient and expeditious. Nonetheless, a myriad of courts from around the country have prohibited this type of appointment. <u>See</u> <u>Mortg. Specialists, Inc. v. Davey</u>, 904 A.2d 652, 673 (N.H. 2006) ("A private attorney who represents the beneficiary of a court order cannot prosecute a criminal contempt action arising from that order.") (citation omitted); <u>In re Peak</u>, 759 A.2d 612, 620 (D.C. 2000) ("We agree with the Supreme Court [in <u>Young</u>] that attorneys for complainants should not be placed in a position so laden with the danger of conflicting loyalties. We therefore conclude that, except under the special circumstances presented in [intrafamily cases], or in some other unusual situation, the court may not appoint counsel for a party who benefits from a court order to prosecute a criminal contempt proceeding arising from alleged noncompliance with that order."); <u>DiSabatino v. Salicete</u>, 671 A.2d 1344, 1352–53 (Del. 1996) ("A criminal contempt proceeding that arises out of civil litigation is 'between the public and the defendant, and is not a part of the original cause.' Consequently, in the event that a private

attorney is appointed to prosecute a criminal contempt which arises from a civil proceeding, that attorney 'should be as disinterested as a public prosecutor who undertakes such a prosecution.' Therefore, the attorney for a party that is the beneficiary of a court order in a civil proceeding 'may not be appointed as a prosecutor in a criminal contempt action alleging a violation of that order.'") (internal brackets and citations omitted); Dep't of Soc. Servs., ex rel. Montero v. Montero, 758 P.2d 690, 693 (Haw. Ct. App. 1988) ("We concur with Young's holdings and conclude they should be applied in the courts of the State of Hawaii. The question is whether the deputy corporation counsel who prosecuted the criminal contempt charge against Montero was an interested prosecutor where the court order which Montero was convicted of intentionally disobeying was obtained at the request of a deputy corporation counsel who represented the beneficiary of the court order. Our answer is yes."); Cantrell v. Commonwealth, 329 S.E.2d 22, 26–27 (Va. 1985) ("We agree with the Ganger court that the position of a private prosecutor having a civil interest in the case so infects the prosecution with the possibility that private vengeance has been substituted for impartial application of the criminal law, that prejudice to the defendant need not be shown. A conflict of interest on the part of the prosecution in

itself constitutes a denial of a defendant's due process rights . . . and cannot be held harmless error.") (internal citations omitted); State ex rel. Koppers Co. v. Int'l Union of Oil, Chem. & Atomic Workers, 298 S.E.2d 827, 830 (W. Va. 1982) ("Although a private prosecutor is held to the same high standards as a public one, the apparent conflict of interest and pressure of 'wearing two hats' militates against permitting a party's private counsel to prosecute a criminal contempt charge stemming from a civil suit; and it makes no difference whether he acts as private lawyer or by appointment as special prosecutor."); Harthun v. Dist. Ct. In and For Second Jud. Dist., 495 P.2d 539, 542 (Colo. 1972) ("[W]e additionally note that, since this involves criminal contempt, the district attorney is the proper officer to prosecute the case."); Peterson v. Peterson, 153 N.W.2d 825, 830 (Minn. 1967) (concluding prosecution in criminal contempt proceeding should not be conducted by parties' private attorney in proceedings out of which contempt arose and "orderly process is better assured if the prosecution is conducted by an attorney for the state"); Leeman v. Vocelka, 32 N.W.2d 274, 278 (Neb. 1948) ("Without question the first part of the charge came clearly within the classification of a constructive criminal contempt, which could only be prosecuted in the name of the State and by information. Private litigants in

such a situation have no right or authority to prosecute such actions, and thus intimidate and harass litigants and public officials under the pretext of preserving the power and vindicating the dignity of the court."); cf. In re Matter of Woodruff, No. 2013-SCC-0030-CIV, 2014 WL 10486959, at *3 (N. Mar. I. Aug. 26, 2014) ("[T]his [c]ourt holds that a prosecuting attorney must be disinterested.  This proposition is a natural corollary to the long-settled principle that the justice system must avoid even the appearance of impropriety.  Allowing prosecutors to prosecute criminal or quasi-criminal cases when they have an interest in a related civil proceeding would do the exact opposite.  Such representation would trigger suspicion each time a prosecutor wielded his or her extensive discretion to investigate and prosecute."); Commonwealth v. Ellis, 708 N.E.2d 644, 650 (Mass. 1999) ("We conclude that due process provisions of [the Massachusetts constitution] require that a prosecutor be disinterested in the sense that the prosecutor must not be nor appear to be influenced, in his or her exercise of discretion, either by his or her personal interests or by a person or entity to whom the prosecution of a criminal case will or may bring significant benefits."); Sinclair v. State, 363 A.2d 468, 475 (Md. 1976) ("[I]f a prosecutor has, or would clearly appear to a reasonable person having knowledge of

the pertinent facts to have, any pecuniary interest or a significant personal interest in a civil matter which may impair his obligation in a criminal matter to act impartially toward both the State and the accused, then he is, on the basis of this State's public policy, disqualified from initiating or participating in the prosecution of that criminal cause."); but see Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154 (10th Cir. 2001) ("[P]articipation of a privately-retained attorney in a state criminal prosecution does not violate the defendant's right to due process . . . unless the private attorney effectively controlled critical prosecutorial decisions[,]" including "whether to prosecute, what targets of prosecution to select, what investigative powers to utilize, what sanctions to seek, plea bargains to strike, or immunities to grant") (internal citations and quotations omitted). Accordingly, while intuition suggests this practice is inconsistent with due process, I cannot conclude with any reasonable certainty that the result reached by the majority is necessarily incorrect under existing case law. I therefore concur in dubitante.